No. 40,469

In the Matter of the Trust Estate of Harry L. Woods, Deceased. (CATHERINE BILLINGS, Individually and as Co-Trustee of the Estate of Harry L. Woods, Deceased, *Appellant*, v. O. H. SANNER, Co-Trustee, THE CITY OF WELLINGTON, and WELLINGTON FOUNDATION, INC., *Appellees.*)

(311 P. 2d 359)

Opinion filed May 11, 1957.

*Howard T. Fleeson* and *Wayne Coulson*, both of Wichita, argued the cause, and *Homer V. Gooing, Paul R. Kitch, Dale M. Stucky, Donald R. Newkirk, Robert J. Hill, Gerrit H. Wormhoudt, Theodore C. Geisert,* and *Philip Kassebaum*, all of Wichita, were with them on the briefs for the appellant.

*W. M. Ferguson* and *Ford Harbaugh*, both of Wellington, argued the cause and were on the briefs for the appellees.

The opinion of the court was delivered by

ROBB, J.: This action to construe a testamentary trust was commenced in the probate court and transferred to the district court where an order of construction of the trust was made, from which order a co-trustee, who is also a beneficiary of the trust, has appealed.

The first question to be solved on appellate review is whether an order of final distribution made and filed by the probate court on July 31, 1951, was *res judicata* to the action which is now before us. That order was made as a result of an application therefor filed by Ellis M. Carr, who was then the executor of the estate of the testator. In the opinion of the trial court the order of final distribution was *res judicata* because of the rule against perpetuities, which rule we will hereinafter discuss.

The order of final distribution made by the probate court substantially set out that Catherine Billings and Frances Woods, who were the only heirs at law of Harry L. Woods, deceased, and were also devisees, legatees, and trustees under his will, had waived notice of hearing of the application of the executor; that certain personal and real properties were found to be assets of the testator's estate; the court *construed* the will and found that the testator gave, devised and bequeathed his entire estate to Ellis M. Carr, Frances Woods, and Catherine Billings as trustees, and to their successors in trust, with such duties, limitations and directions as were set forth in the will; the court found there was no further business to transact in the administration of the estate and final distribution should be ordered; that all personal and real properties were vested in Ellis M. Carr, Frances Woods, and Catherine Billings, as trustees of the estate of the testator, and the executor was to be discharged when, as directed, he had assigned all the assets of testator's estate to such trustees.

It is undisputed that this order was a proper exercise of power by the probate court at the time. While it is true that the probate court in its order used the word "construe," it is also quite apparent the only construction made of the will was that legal title to the assets of the testator's estate was vested in the trustees with such duties, limitations and directions as were set forth in the will.

There were certain equitable life estates carved out of the assets of the testator's estate, which will be discussed later in more detail. No one contends that the trusts created for Frances Woods and Catherine Billings during their respective lives were invalid. It will be seen that Frances was testator's widow and Catherine was their daughter. We find a very similar trust provision in the case of *Beverlin v. First National Bank*, 151 Kan. 307, 98 P. 2d 200, where a trust for the benefit of testator's daughters for life was held to be a valid trust even though a later provision for the benefit of granddaughters who attained the age of twenty-five years was held to be void because it was in contravention and violation of the rule against perpetuities.

Appellees contend that the order of the probate court finally and for all purposes construed the entire will and since no appeal was taken therefrom that such order was *res judicata* to this action by Catherine, one of the co-trustees, for direction as to how to proceed, and by her individually as beneficiary to determine her rights as such. We can find nothing in the order of final distribution made

and entered by the probate court that went beyond the vesting of legal title to the assets of testator's estate in the trustees as above stated.

To be more specific as to what Catherine is seeking, her petition in substance asks for a determination of her beneficial interest, as an individual, and for clarification and directions of the court as to the duties and obligations of the trustees, and of her duties and obligations as a co-trustee, in executing the provisions of the testamentary trust.

At this point we should explain that the will provided for the appointment of a successor to Ellis M. Carr, co-trustee, now deceased, and O. H. Sanner was subsequently appointed. The will further provided that no successor was to be appointed upon the death of either Frances or Catherine. In other words, there were three original trustees but ultimately there will be only one. Frances died July 13, 1954, and the trust for her benefit and her tenure as trustee have, of course, expired. This leaves us with only Catherine and Sanner as co-trustees and a controversy exists between them as to the meaning of the provisions of the testamentary trust subsequent to the death of Frances.

· In our opinion the trial court incorrectly determined the issue of *res judicata* because in trust matters a court retains jurisdiction to manage the trust and control the trustees. (G. S. 1949, chapter 59, article 16; *In re Estate of Lowe*, 155 Kan. 679, 687, 127 P. 2d 512; 2 Bartlett's Kansas Probate Law and Practice, rev. ed., § 932.) The probate code enacted by the legislature in 1939 empowered the probate courts of Kansas with equity jurisdiction so that under the general rule such courts have a capacity equivalent to a universal trustee. Jurisdiction may be exercised by the probate court over the administration of a trust upon an application of a trustee for guidance where necessary for his protection. On such proper application a trustee may ask directions of a court as to the construction of a trust instrument, as to the proper method of administration of the trust—if construction thereof is difficult—or as to what persons are entitled to the benefits. Where a trustee has real doubts to be solved he not only may, but for his own protection should, seek the court's guidance. (54 Am. Jur., § 276, et seq., pp. 219-224.)

This court has previously passed on the question of the jurisdiction of the probate court and its power to supervise trust estates under our present probate code. In *In re Estate of Porter*, 164 Kan. 92, 187 P. 2d 520, it was said:

"The new Kansas Probate Code (G. S. 1945 Supp., ch. 59, art. 3) not only specifically confers jurisdiction upon the probate courts to administer trusts but makes ample provision for their supervision, direction and control." (Syl. ¶ 4.)

To hold otherwise than above stated would be inconsistent with the general rule, and with the same rule laid down and adhered to by our own statutes and decisions. When a trustee comes into court and asks for directions, as was done here by Catherine, he is not precluded from so doing by an order of final settlement such as was made by the probate court in this case which carried out only the placing of legal title in the co-trustees to carry out the trust.

The cardinal principle for the construction of a will is that it must be in conformity with the intention of the testator as that intention is gleaned from the four corners of the instrument when all provisions of the will are considered without deleting any part thereof (*Diver v. Hendrix*, 178 Kan. 253, 257, 284 P. 2d 1080), but prior to further discussion of that matter, it may be well to note the type of person the testator here was and what some of his everyday activities were since he was the scrivener of his own will. Harry L. Woods was owner, editor and publisher of the Wellington Daily News for forty-eight years and as such was a careful and accurate user of the English language. He was quite active and was extremely interested in the civic affairs of Wellington. He had assisted in the acquisition to the city of Woods Park, containing municipal park, golf and swimming pool facilities, which had been pasture land belonging to the estate of his parents. The park was named after testator and surrounded block 13, Fultz and Millard's addition on three sides. Testator was one of three organizers of the Wellington Foundation and was very active therein until the time of his death. He was also an attorney, he had practiced law as a member of a well-known firm in Wellington, and was at one time county attorney of Sumner county. Daily visits were made by testator to Woods Park. He was chairman of the Wellington park board for many years and maintained active personal supervision of both Woods Park and East Park in that city. Prior to his death testator had long made plans and collected materials for the beautification and improvement of the Wellington parks.

With this brief background of the man whose will is being considered, we now set out all parts of that instrument which are pertinent to the determination of our two remaining questions:

"*b.* It is my will and I hereby direct that the entire annual net income from the trust estate be paid to my wife Frances Woods as long as she shall

live and I hereby give and bequeath said entire net income of said trust estate to my said wife as long as she shall live. Upon the death of my wife, if my daughter Catherine has survived her, it is my will and I hereby direct that if and when my said daughter's personal funds become depleted, from that time on the entire net income from said trust estate be paid to my said daughter Catherine as long as she shall live and I hereby give and bequeath said entire future net income of said trust estate to my said Catherine as long as she shall live.

"c. It is my wish and will that as soon as possible after the death of my wife and daughter the residue of my estate shall be turned into cash and used to improve the Wellington public parks and playgrounds in the following manner:

"(1) By purchasing and deeding to the city of Wellington any property in Block 13 Fultz and Millard's Addition as rapidly as it can be obtained at a fair price;

"(2) By purchasing and deeding to the city of Wellington any lots facing the north side of Harvey Avenue between Hargis Creek and the west side of Cherry Street; thus to add to the beauty and usefulness of the Sellers-Community Park.

"(3) The Wellington Foundation, Incorporated, was granted a state charter in 1947 and duly organized. How well it will function cannot be known at the time this will is made. At the death of the last of my two survivors, my wife and daughter, it is my wish that the management and prospects of The Wellington Foundation, Incorporated, be carefully studied by my then executor. If, after such careful study my executor is convinced that all funds coming into its treasury will be safely and prudently administered in the public interest, it is my wish that any remaining funds in my estate be transferred to such Foundation, either in toto or by lesser sums to be transferred to such Foundation, in annual installments, as his judgment may dictate. Should any of my estate be transferred to the Foundation, and should Wellington have acquired in the meantime a college or junior college, it is my wish that any remaining funds in my estate, after the purchases mentioned in sections 1 and 2 above, be used to foster and promote the work of such college. If, after careful study, my executor should not believe that funds transferred to the Foundation would be safely and prudently administered, it is my wish that the funds, if any remaining be used by my executor in any manner thought desirable for the improvement of Wellington parks and playgrounds.

"d.—While it is my desire and hope that my estate shall remain undiminished and that only the net income therefrom shall go first to my wife, and after her death to my daughter, under the conditions stated, the entire estate then to add to the recreational facilities of the citizens of Wellington, I am not unmindul of a changing world and its many disappointments. Wherefore it is my will and desire that throughout their lives my wife and daughter shall possess all the necessaries and such luxuries as they have, generally speaking, grown accustomed to during my life, and if after my death the income from the trust estate shall fail to fully provide such necessaries, comforts, and luxuries, it is my will and desire that there shall be paid to my wife during her lifetime out of the funds of my estate any additional sums above the annual income, needed for her comforts and even for any desired luxuries. And the same

generous treatment is to be given my daughter Catherine after my wife's death, if there should be need after considering her own separate resources and income, a full report of which should be given at any time asked by my executor.

"*e.*—To my executor and to his successors, if any, I make it plain that the essence of this testament is that the funds in my estate are to be used first to provide for the comfort and happiness of my wife, Frances Woods, during her lifetime, and after my wife's death to provide for the comfort and happiness of my daughter, Catherine Billings. That in case either shall become mentally or otherwise incapacitated, she shall be constantly provided with the u*p*most in care, comfort, and medical attention. And to effect these requirements I direct that the funds of the estate be applied without stint or quibble. This is my living responsibility and I direct that it be continued after my death to the last penny of my estate, if necessary to serve my wife, whose active, intelligent and self sacrificing help in building that estate is hereby gratefully and lovingly acknowledged."

Catherine contends there has been sufficient compliance with the condition of the testator's will ". . . *that if and when my said daughter's personal funds become depleted . . .*" to entitle her to share in the net proceeds from her father's estate. From the evidence introduced before the trial court it was concluded, as is contended by appellees, that Catherine's funds had not become depleted and as a result she was not entitled to share in the net proceeds as Frances had shared during the latter years of her life after testator's death. We are inclined to disagree with the trial court on this point for the reason that too narrow a construction was placed on the condition. As has often been said, the intention of a testator must be determined from the whole will—from the four corners of the instrument. (*Walker v. Koepcke,* 177 Kan. 617, 622, 282 P. 2d 382; *Diver v. Hendrix,* supra.) Had the will stopped with subparagraph 5 (b), such a conclusion as that reached by the trial court may have been more tenable but the further provisions of subparagraph 5 (d) and the early part of subparagraph 5 (e) make it clear that Frances and Catherine were to possess all the necessaries, comforts and such luxuries as they had, generally speaking, grown accustomed to during testator's life. From testator's many achievements during his lifetime, it must be recognized that he was fully cognizant of the legal, as well as the grammatical, significance of the terms used in his will. Courts dealing with instruments so drawn are obliged in most instances to construe the terms thereof in accordance with their technical meaning. (*Householter v. Householter,* 160 Kan. 614, 617, 164 P. 2d 101.)

Without detailing the lengthy testimony included in the record,

it is quite evident that Catherine's financial status, her comfort and the luxuries to which she had become accustomed during the lifetime of her father were less when her funds became depleted. Appellees agree that *depleted* as used did not mean that Catherine would be forced to spend her last penny or be a subject for charity before she could share in testator's estate. It is definite that if such a thing as this were to happen, she would not only share in the net income but could well use up the corpus of the estate without stint or quibble, under subparagraphs 5 (d) and 5 (e) of testator's will.

The trial court, in substance, found that Catherine should have the income, as well as the principal, provided her finances were "depleted"; that Catherine had assets in excess of $50,000 and testator fully realized her condition when executing his will so that "depleted" was used to denote when Catherine's estate was fully used, or used to the extent there would be a question as to her having and living in the manner in which she was accustomed to live and did not mean when *a portion* of the estate of the daughter was used. Hereby the trial court itself realized that it would be sufficient if Catherine's estate was used to the extent there would be a question as to her having and living in the manner to which she was accustomed but it qualified that determination by tacking on a meaning that could only meet the definition of *exhaust*. The only evidence before the trial court on the word *exhaust* was that it is *not* a synonym of *deplete* and that only a few very modern writers use the words synonymously.

Appellees submit the following meaning of *deplete*, and we think it is an apt one in this case,

"Deplete is often used as though it implied merely a reduction in numbers, in quantity, or the like; discriminating writers or speakers, however, employ it only when they wished to suggest the potential harm of such a reduction or the impossibility of restoring what has been lost before such consequences are evident."

The record shows that Catherine was a woman past sixty years of age. She had lost access to the use of two automobiles and had lost income from her employment in the sum of approximately $45.00 per week. These were some of the facts which showed what she was accustomed to during testator's life that she did not have at the time of Frances's death. With this in view, we refer to subparagraph 5 (d) of testator's will in regard to reports of Catherine's own separate resources and income which are to be given by her to the executor at his request. Without making this portion of the

will ineffective, we must consider that the testator intended to provide Catherine with that part of the net income of his estate necessary to provide protection against her losing those necessaries, comforts or even luxuries to which she was accustomed during his lifetime. It would be ridiculous to say at Catherine's age that restoration of these things would be merely a matter of course. It would seem harsh to say that Catherine's funds had to be entirely used up and when they were, then immediately restore her to the level of living to which she was accustomed during the lifetime of her father. This system would be like a double-edged sword because it would work a hardship on Catherine while she was losing everything and then it would really diminish the assets of the estate when her position, as intended by testator, was re-established. A woman of Catherine's age would not be able to recoup those things which she might lose from time to time, and we think it was never the intention of her father that the executor-trustee should have the power to do what he is here attempting to do. Otherwise, the testator would have had no reason to make Frances and Catherine co-trustees. The executor-trustee had a duty to see to two things: First, that Frances, and second, that Catherine were maintained in their respective positions in life, as set out in the will. If the executor did not do this, either or both of them could come into court in the capacity of co-trustee, exactly as Catherine is doing here, and the court then had the duty to carry out the intention of the testator under the terms of his will. This the trial court failed to do. If the executor-trustee believes that Catherine may not need the entire net proceeds from the testator's estate, the will provides a method for him to determine what she does need. From the appearance of things on the surface the executor-trustee is totally ignoring testator's use of the term "without stint or quibble" and is at least *quibbling* over what Catherine needs—if he is not trying to *stint* her. We can see no other result to this phase of the lawsuit than that Catherine is entitled to the net proceeds of testator's estate and if the executor-trustee is of the opinion that such a share is too large, then it is his right to request, and her duty to furnish, a report so that it can be determined by the executor-trustee, and in turn by the court, to what sums she is entitled from time to time to keep her in that position in life intended by the testator.

We are finally confronted with the problem of what is to become of the estate after Catherine's death. Appellees contend they take under the will while Catherine contends that the gift over to ap-

pellees violates the rule against perpetuities and is, therefore, void. Catherine's theory would place the ownership of the entire estate in her as the sole surviving heir at law of her father.

The terms of this will are explicit. Our rule of law is quite plain and we need no further rules of construction, such as the doctrine of *cy pres* mentioned by the parties, to determine the intention of the testator. True, one may not be able to arrive at the full purport of this will with a single cursory examination, but when studied and analyzed, its terms are clear.

The very idea of a life estate presupposes a fee existing elsewhere than in the tenant for life (*Alexander v. Goellert*, 153 Kan. 202, 205, 109 P. 2d 146) and we recognize that after the life estates in trust for Frances and Catherine terminate, then the trust in favor of appellees takes effect unless Catherine's contention that it violates the rule against perpetuities is correct.

In subparagraph 5 (*c*) of the will the testator made it clear that the cash derived from the sale of the assets of his estate was to be used to improve the Wellington public parks and playgrounds in the manner set out in sections (1), (2), and (3) of subparagraph 5 (*c*). Under subparagraph 5 (*d*) the entire estate, after the deaths of Frances and Catherine, was then to be used "to add to the recreational facilities of the citizens of Wellington." Wellington had public parks, playgrounds and recreational facilities for its citizens at the time of testator's death and it still has them so far as the record discloses.

The rule against perpetuities has been stated many times and in *In re Estate of Davis*, 171 Kan. 605, 237 P. 2d 396, it was again set out as meaning that no future interest in property can lawfully be created which does not necessarily vest within twenty-one years after some life or lives presently in being, excluding from such computation of years the incipient life of infants *in ventre sa mere.*

Broadly stated, the rule against perpetuities is grounded traditionally on a farsighted public policy which frowns on the total exclusion of property from commerce for long periods of time and is supported by the practical needs of modern times (*Lasnier v. Martin*, 102 Kan. 551, 554, 171 Pac. 645); it governs both legal and equitable interests, and interests in both realty and personalty. (Gray, The Rule Against Perpetuities, 4th ed., § 202, p. 192.) In *Bunting v. Speek*, 41 Kan. 424, 21 Pac. 288, this court set out the rule that no remainder will be construed to be contingent which may, consistently with the words used and the intention expressed,

be deemed vested. Courts are inclined toward a construction favorable to the early vesting of an estate so as not to defeat the intent of the testator but there must necessarily be a vesting within the limits of the rule against perpetuities. (*Klingman v. Gilbert,* 90 Kan. 545, 548, 549, 135 Pac. 682; *Tretbar v. Aged Ministers Home,* 180 Kan. 18, 21, 299 P. 2d 58.)

An estate vests in possession when there is an accrued, fixed and indefeasible right to present enjoyment while an estate vests in interest when there is a present accrued, fixed and indefeasible right to enjoyment at a future time. (*McEwen v. Enoch,* 167 Kan. 119, 123, 204 P. 2d 736.) Thus it is noted that unless a contrary intention clearly appears in a testamentary instrument, an interest will be regarded as vested rather than as contingent. (*In re Estate of Hauck,* 170 Kan. 116, 223 P. 2d 707.) For a more thorough discussion and comparison of contingent and vested remainders, see *McLean v. Stanley,* 134 Kan. 234, 5 P. 2d 839. There a vested remainder was said to exist when a present interest passes to a certain and definite person but is to be enjoyed in the future, while a contingent remainder is where the estate in remainder is limited either to a dubious and uncertain person, or upon the happening of a dubious and uncertain event. (p. 239.) Attention is also directed to *Faris v. Nickel,* 152 Kan. 652, 107 P. 2d 721, for a similar discussion and comparison.

An estate may properly vest within a life or lives in being irrespective of how long possession and enjoyment of the property may be postponed. (*Klingman v. Gilbert,* supra.) The rule against perpetuities has reference to the time within which title vests. A vested interest does not necessarily include a right to possession and if the title is vested, the interest is not subject to the rule however remote may be the time when it may come into possession. (*Goetz v. Goetz,* 174 Kan. 30, 38, 254 P. 2d 822; *In re Estate of Sheets,* 175 Kan. 741, 745, 746, 267 P. 2d 962.)

Appellant, relying on the gift over being contingent and therefore in violation of the rule against perpetuities, cites *Malmquist v. Detar,* 123 Kan. 384, 255 Pac. 42, where the title vested in the governing board of a hospital if a hospital were established. No hospital was established nor was there any evidence that one would ever be established when testator died so the gift was held void. She also cites *Watrous v. Limbocker,* 140 Kan. 154, 157, 33 P. 2d 938, where title vested in a beneficiary contingent upon the failure of the existence of a religious organization and the provision was

held void. Other cases were cited but they cannot control here because they presented true contingent remainders that were never likely to vest in title within the prescribed time.

The title received by the citizens of Wellington vested at the death of the testator and the enjoyment of possession was only retarded until the deaths of Frances and Catherine. We are committed by our many pronouncements on the rule against perpetuities and we must, therefore, conclude that the title involved here was vested and was not in violation of the rule.

The equitable interest determined to be vested in the citizens of Wellington cannot be determined ineffective because the use might be in perpetuity. The case of *Curtis v. Board of Education*, 43 Kan. 138, 143, 144, 23 Pac. 98, involved the granting of a lot for the erection of a school building thereon and for no other purpose. This was merely a limitation upon the use and had no effect as a condition precedent or subsequent and title to the lot vested when the school building was built. Another case is *Schnack v. City of Larned*, 106 Kan. 177, 181, 186 Pac. 1012, where it was held a grant of a residuary estate to a city to be used for public park purposes vested the property in the city with merely a limitation as to its use. *Treadwell v. Beebe*, 107 Kan. 31, 38, 39, 190 Pac. 768, involved a use by everybody in Anthony, Kansas, who needed and deserved relief from cold and hunger, together with an additional use for the assistance of any person anywhere suffering from cancer in its early stages. It was there determined that a public trust had been created and legal title vested in the trustee for the public, charitable use prescribed in the will. Thus it can be seen that a limitation on use which may be in perpetuity cannot be considered as a condition precedent or subsequent to destroy a vested interest and thereby make it violative of the rule against perpetuities.

As suggested, each particular will providing a charitable trust must be examined to determine whether it be a particular or a general charity since it must be frankly conceded there is lack of harmony in the decisions as to what constitutes an intent to create a general charity or a particular charity. (*Shannep v. Strong*, 160 Kan. 206, 214, 160 P. 2d 683.)

We are bound by the rule stated in *In re Estate of Porter*, 164 Kan. 92, 187 P. 2d 520.

". . . charitable trusts are favorites of the law which must be upheld whenever possible, and . . . once it has been determined a will contains language creating such a trust other language to be found therein which is

susceptible of more than one construction must be liberally construed for the purpose of carrying out the intention of the donor." (p. 100.)

See, also, Simes and Smith, The Law of Future Interests, 2d ed., § 1279, p. 218; Gray, The Rule Against Perpetuities, 4th ed., § 607, p. 581.

Attention should also be directed to the case of *Hollenbeck v. Lyon*, 142 Kan. 352, 356, 358, 47 P. 2d 63. There a will devised a life estate in the income from certain real property to a named beneficiary after which it was to be held in trust for the use and benefit of the needy poor in and around Abilene. This court determined (1) the trust was vested in a trustee to be administered for the specific charitable purposes testatrix had in mind; (2) the remainder was vested in a charitable trust which was not void because of the indefiniteness of individual beneficiaries; and (3) there was no reason to hold such a worthy disposition of property to be invalid.

The parties raise the question of precatory and mandatory words and without dwelling at length thereon we deem it sufficient to refer to discussions already contained in our reports. (*Diver v. Hendrix*, supra; *In re Estate of Charowhas*, 181 Kan. 322, 310 P. 2d 947, this day decided.)

We mention in passing that an objection was raised because the trial court allowed certain amendments to the pleadings but there was no prejudice shown thereby and we will not disturb the ruling on appeal since such matters are left largely to the discretion of the trial court. (*Badders v. Checker Cab Co.*, 118 Kan. 125, 130, 234 Pac. 41; *Davison v. Eby Construction Co.*, 169 Kan. 256, 218 P. 2d 219.)

While appellant relies on those parts of the will contained in section (1), (2), and (3) of subparagraph 5 (*c*) as being in contravention of the rule against perpetuities, we can only say that the law as stated *In re Estate of Porter*, supra, is directly contrary to such theory. Especially is this true since we can see no other determination, in view of what has been herein said, than that the testator created a life estate in trust to Frances; at her death a life estate for Catherine; and at Catherine's death a general and public charitable trust for the citizens of Wellington to be used for the improvement of the public parks, playgrounds and recreational facilities of that city. The legal title vested in the co-trustees at testator's death and the beneficiaries were vested with the equitable title at testator's death, so that in nowise was the rule against perpetuities

violated. The trusts created were therefore valid. (See, also, Gray, The Rule Against Perpetuities, § 678, p. 630.)

We are appreciative of the very excellent briefs submitted by counsel for both parties. The briefs were well prepared and when considered in conjunction with the record furnished us, they display a thorough treatment not only of the case but also of the authorities relative to the issues raised therein.

The judgment of the trial court is affirmed as to its determination of the validity of the general and public charitable trust to the appellees. It is modified as to its determination of the question of *res judicata* and also as to its determination of the equitable interest of Catherine. With respect to its order regarding Catherine's beneficial interest, the trial court is directed to make an order that will carry out the intention of the testator, as shown by the terms of the will and in keeping with the rulings in this opinion.

PRICE, J., concurs in the result.